IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 25-** |
| v. | : | DATE FILED: _____ |
| **SCOTT MASON** | : | VIOLATIONS:<br>18 U.S.C. § 1343 (wire fraud – 2 counts) |
| | : | 15 U.S.C. §§ 78j(b), 78ff, and 17 C.F.R. § 240.10b-5 (securities fraud – 1 count) |
| | : | 15 U.S.C. §§ 80b–6 and 80b–17 (investment adviser fraud – 1 count) |
| | : | 26 U.S.C. § 7206(1) (filing false income tax returns – 5 counts) |
| | : | Notice of forfeiture |

**INFORMATION**

**COUNT ONE**
**(Wire Fraud)**

**THE UNITED STATES ATTORNEY CHARGES THAT:**

**BACKGROUND**

At all times material to this information:

1. Defendant SCOTT MASON was a resident of Gladwyne, in the Eastern District of Pennsylvania.

2. Defendant SCOTT MASON was president of, and exercised control over, Rubicon Wealth Management LLC ("Rubicon"), an investment advisory firm headquartered first in Bala Cynwyd, Pennsylvania and subsequently in Blue Bell, Pennsylvania, both in the Eastern District of Pennsylvania.

3. Rubicon was registered with the U.S. Securities and Exchange Commission ("SEC") as an investment adviser. Defendant SCOTT MASON was Rubicon's sole investment adviser.

4. Rubicon's clients were primarily high net worth individuals with substantial sums to invest. As of March 2024, Rubicon had approximately 115 clients and approximately $231 million in assets under management. The majority of Rubicon's assets under management were held at two custodians, SEI Private Trust Company ("SPTC") and Fidelity Investments ("Fidelity"). Some Rubicon clients held additional investments outside these two custodians, including investments in hedge funds and private equity.

5. Clients of Rubicon entered into a Wealth Management Agreement, pursuant to which they selected either discretionary or non-discretionary asset management services provided by defendant SCOTT MASON. Many of Rubicon's clients permitted defendant MASON to manage their assets on a discretionary basis and to make investment decisions on their behalf, consistent with their investment objectives and risk tolerance, which they conveyed to and discussed with defendant MASON.

6. Rubicon's clients paid Rubicon either a fixed annual fee, an asset-based fee (a small percentage of their assets under management), or a combination of the two.

7. Defendant SCOTT MASON knew that his investment adviser role imposed on him a fiduciary duty with regard to his clients. He understood that he was obligated to make investment decisions in his clients' best interests and not his own, that he was required to act with his clients' individual risk characteristics in mind, and that he was obligated to disclose to his clients any potential conflicts of interest that affected him or Rubicon.

8. Orchard Park Real Estate Holdings LLC ("OPRE") was a Pennsylvania limited liability company owned and controlled by defendant SCOTT MASON. OPRE was registered with the Pennsylvania Department of State in or about June 2016, with a registered address at defendant MASON's home address in Gladwyne, Pennsylvania.

9. Defendant SCOTT MASON formed OPRE to act as a holding company for several residential investment properties that defendant MASON purchased in Geneva, New York. OPRE generated rental income from these properties, which served as housing for college students, amounting to approximately $20,000 to $30,000 annually. Defendant MASON was the sole signatory on all OPRE financial accounts. Defendant MASON did not identify OPRE as an affiliated entity in Rubicon's annual SEC Form ADV.

## THE SCHEME

10. From in or about December 2016 through in or about April 2024, in the Eastern District of Pennsylvania, and elsewhere, defendant

## SCOTT MASON

devised and intended to devise a scheme to defraud clients of Rubicon and to obtain money and property by means of false and fraudulent pretenses, representations, and promises.

## MANNER AND MEANS

It was part of the scheme that:

11. Beginning in or about December 2016, defendant SCOTT MASON periodically transferred funds from several Rubicon client advisory accounts at SPTC and Fidelity to bank accounts belonging to OPRE and controlled by defendant MASON, without the clients' knowledge or authorization. A single transfer ranged from as little as a few thousand

3

dollars up to $1.25 million. Defendant MASON utilized these funds primarily to finance his lifestyle and to repay his debts.

12. Defendant SCOTT MASON targeted Rubicon clients with whom he had a longstanding relationship and who trusted him implicitly, including longtime friends and family members, knowing that these individuals were unlikely to question him about his management of their assets.

13. Defendant SCOTT MASON also targeted Rubicon clients who had substantial liquid assets in their accounts, including clients who had recently sold businesses or property or who had recently come into an inheritance, knowing that these individuals would be less likely to notice missing funds.

14. In order to fund the unauthorized transfers to OPRE, defendant SCOTT MASON often liquidated Rubicon clients' securities holdings.

15. On some occasions, defendant SCOTT MASON forged Rubicon clients' electronic or ink signatures on distribution authorization forms, without the clients' permission. On other occasions, defendant MASON presented the distribution forms to a client for signing but omitted all pertinent details regarding the so-called "investment" he was asking the client to authorize, including his relationship to OPRE, or falsely represented to the client that he was transferring the clients' funds outside SPTC or Fidelity to invest in diversified short-term bonds.

16. In general, defendant SCOTT MASON did not volunteer any information regarding OPRE to Rubicon clients from whose accounts he transferred funds. If a client ever saw a reference to OPRE on an SPTC or Fidelity account statement and asked defendant MASON about the nature of the transfer, defendant MASON lied to the client and informed the client that he had invested the client's funds in bonds outside SPTC or Fidelity, which accounted

for why the investments were not reflected on the client's SPTC or Fidelity statements. Defendant MASON never disclosed to any Rubicon client the fact that his true intention was not to invest Rubicon clients' funds on their behalf but rather, to use the funds to finance his lifestyle.

17. In furtherance of his fraudulent scheme, defendant SCOTT MASON transferred a total of approximately $3,225,000 to OPRE from a Rubicon advisory account at SPTC belonging to victim S.S., a Rubicon client who had known defendant MASON for decades. Defendant MASON conducted a total of approximately 32 fraudulent transfers from victim S.S.'s account to OPRE between November 2019 and December 2023.

18. In order to fund the transfers from victim S.S. to OPRE, defendant SCOTT MASON sold shares of money market funds (highly liquid mutual funds) owned by victim S.S. and wired the proceeds from these sales to OPRE bank accounts controlled by defendant MASON. Among the money market funds that defendant MASON sold in order to finance his fraudulent transfers from victim S.S. to OPRE were government funds AABXX and SEOXX, both of which were listed on the Nasdaq stock exchange.

19. In or about 2019, when defendant SCOTT MASON began making fraudulent transfers from victim S.S. to OPRE, defendant MASON approached victim S.S. about a bond investment opportunity outside SPTC that would pay victim S.S. interest. Victim S.S. authorized some of the distributions from SPTC under the false impression that defendant MASON would invest the distributions in bonds. On other occasions, defendant MASON forged victim S.S.'s signature on SPTC's distribution forms without victim S.S.'s permission. Defendant MASON did not invest victim S.S.'s funds in bonds or pay victim S.S. interest as promised. Moreover, defendant MASON did not inform victim S.S. that he had in fact

5

transferred victim S.S.'s funds to OPRE, an entity that defendant MASON controlled, or that the transfers were not legitimate investments but were made for defendant MASON's sole benefit.

20. In total, between December 2016 and April 2024, defendant SCOTT MASON transferred more than $17 million belonging to approximately 13 Rubicon clients—including victim S.S. and other similarly situated clients—to three different bank accounts belonging to OPRE and controlled by defendant MASON. Defendant MASON used the proceeds of his fraud to finance his lifestyle and personal expenditures, including international travel, country club membership dues, credit card bill payments, and the purchase of an ownership stake in a miniature golf course in Barnegat Light, New Jersey. Defendant MASON also used a substantial portion of the fraud proceeds to repay another Rubicon client, S.T., from whom defendant MASON had been misappropriating funds for many years, in order to avoid detection of that second fraudulent scheme by S.T.

21. On or about May 4, 2023, in the Eastern District of Pennsylvania, and elsewhere, defendant

**SCOTT MASON**,

for the purpose of executing the scheme described above, caused to be transmitted by means of wire communication in interstate commerce the following signals and sounds, specifically, a wire transfer in the amount of approximately $550,000 from Rubicon client S.S.'s account ending 2745 at SPTC to OPRE's account ending 5692 at JPMorgan Chase, originating from an SPTC server located in Oaks, Pennsylvania and passing through a JPMorgan Chase server located outside the Commonwealth of Pennsylvania. The funds to support this wire transfer were generated by defendant MASON's sale of 550,000 shares of money market mutual fund AABXX held by victim S.S.

All in violation of Title 18, United States Code, Section 1343.

## COUNT TWO
## (Wire Fraud)

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

1. Paragraphs 1 through 9 and 11 through 20 of Count One are incorporated here.

## BACKGROUND

At all times material to this information:

2. Victim S.T., a resident of Villanova, Pennsylvania, was a client of Rubicon.

3. Victim S.T. was unique among Rubicon's clients in that defendant SCOTT MASON provided not only investment advisory services to victim S.T. but also a full range of concierge services. These concierge services included bill payment, assisting with the upkeep and maintenance of S.T.'s multiple residential properties, and collecting and opening S.T.'s mail.

4. In order to facilitate defendant SCOTT MASON's provision of this wide range of financial services, victim S.T. granted defendant MASON full access to S.T.'s bank and credit card accounts.

5. Defendant SCOTT MASON also paid some of S.T.'s expenses directly from accounts belonging to Rubicon. These expenses included tickets for sporting events, various bills, and cash advances periodically requested by victim S.T.

6. Defendant SCOTT MASON and victim S.T. agreed on a fixed annual fee to compensate defendant MASON for both his asset management and concierge services.

7. Victim S.T., who had known defendant SCOTT MASON since the 1990s, trusted defendant MASON to manage his finances and act in victim S.T.'s best interests. Victim S.T. did not closely review or question defendant MASON's management of his finances.

## THE SCHEME

8. From at least in or about January 2014 through in or about July 2024, in the Eastern District of Pennsylvania, and elsewhere, defendant

## SCOTT MASON

devised and intended to devise a scheme to defraud victim S.T. and to obtain money and property by means of false and fraudulent pretenses, representations, and promises.

## MANNER AND MEANS

It was part of the scheme that:

9. Defendant SCOTT MASON took advantage of victim S.T.'s trust and his unfettered access to victim S.T.'s financial accounts and periodically transferred more than the amount to which he was entitled in legitimate investment adviser/concierge fees from victim S.T.'s accounts to accounts in defendant MASON's own name at Bancorp, PNC, and JPMorgan Chase, as well as to Rubicon accounts at Bancorp, PNC, and WSFS.

10. Defendant SCOTT MASON initiated these additional payments from victim S.T.'s accounts on an ad hoc basis. The timing and amount of these fraudulent transfers correlated with a need to cover expenses incurred by Rubicon and defendant MASON personally. Defendant MASON also reimbursed himself on an inconsistent basis for legitimate expenditures that he and Rubicon incurred on victim S.T.'s behalf.

11. To avoid detection and further the fraudulent scheme, defendant SCOTT MASON frequently ignored victim S.T.'s instructions with respect to the management of victim

S.T.'s finances. In one instance, victim S.T. instructed defendant MASON to pay off a line of credit at JPMorgan Chase totaling approximately $5 million with the proceeds from the sale of one of victim S.T.'s properties. Defendant MASON represented to victim S.T. that he had paid off the line of credit but in fact did not do so, which resulted in additional interest charges to victim S.T. totaling more than $1.48 million.

12. In another instance, victim S.T. directed defendant SCOTT MASON to transfer approximately $5 million in bonds held by victim S.T. to a newly created family trust. Although victim S.T. instructed defendant MASON to open and fund an account associated with the family trust, defendant MASON neither opened the account nor transferred the bonds to fund that account, because those bonds were acting as collateral for the outstanding, purportedly paid-off line of credit at JPMorgan Chase. Instead, defendant MASON created fraudulent account statements and IRS Forms 1099 purporting to show that defendant MASON had transferred the bonds into the family trust when in fact he had not done so.

13. To further avoid detection, beginning in or about 2017, defendant SCOTT MASON periodically transferred money back to accounts owned by victim S.T. On occasion, defendant MASON initiated these transfers back to victim S.T. either from one of defendant MASON's personal accounts or from one of Rubicon's accounts. The most significant return transfers to victim S.T., however, came from OPRE accounts. Defendant MASON transferred several million dollars—which defendant MASON had misappropriated from other Rubicon clients—from OPRE accounts to accounts belonging to victim S.T. between 2017 and 2024, all in order to conceal the fact that defendant MASON had been misappropriating funds from victim S.T. for many years.

14. The result of defendant SCOTT MASON's frequent transfers to and from victim S.T.'s accounts was that in some years, defendant MASON paid himself and/or Rubicon less than the amount to which he was entitled and in other years, he paid himself and/or Rubicon far more than the amount to which he was entitled. Throughout, defendant MASON knowingly abused victim S.T.'s trust by helping himself to funds belonging to victim S.T. to which he was not entitled whenever he wanted them. As a result of defendant MASON's fraudulent scheme, between January 2014 and July 2024, victim S.T. suffered millions of dollars in losses.

15. On or about December 30, 2020, in the Eastern District of Pennsylvania, and elsewhere, defendant

**SCOTT MASON**,

for the purpose of executing the scheme described above, caused to be transmitted by means of wire communication in interstate commerce the following signals and sounds, specifically, a wire transfer in the amount of approximately $50,000 from Rubicon client S.T.'s account ending 1009 at JPMorgan Chase to Rubicon's account ending 3837 at PNC, passing through both a PNC server located in Virginia and a JPMorgan Chase server located outside the state of Virginia.

All in violation of Title 18, United States Code, Section 1343.

## COUNT THREE
### (Securities Fraud)

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

 1. Paragraphs 1 through 9 and 11 through 20 of Count One are incorporated here.

 2. From in or about December 2016 through in or about April 2024, in the Eastern District of Pennsylvania, and elsewhere, defendant

### SCOTT MASON

willfully and knowingly, by the use of the means and instrumentalities of interstate commerce and the facilities of national securities exchanges, directly and indirectly, used and employed manipulative and deceptive devices and contrivances in contravention of the rules and regulations prescribed by the Securities and Exchange Commission, namely, 17 C.F.R. § 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons, in connection with purchases and sales of securities held by Rubicon clients, including shares of money market mutual funds AABXX and SEOXX.

 In violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

## COUNT FOUR
### (Investment Adviser Fraud)

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

    1.    Paragraphs 1 through 9 and 11 through 20 of Count One are incorporated here.

    2.    From in or about December 2016 through in or about April 2024, in the Eastern District of Pennsylvania, and elsewhere, defendant

### SCOTT MASON

unlawfully, willfully, and knowingly, directly and indirectly, by the use of the mails and means and instrumentalities of interstate commerce, while acting as an investment adviser with respect to clients of Rubicon, an investment adviser, did, and caused Rubicon to: (a) employ devices, schemes and artifices to defraud clients and prospective clients; (b) engage in transactions, practices, and courses of business which operated as a fraud and deceit upon clients and prospective clients; and (c) engage in acts, practices, and courses of business that were fraudulent, deceptive, and manipulative.

    In violation of Title 15, United States Code, Sections 80b–6 and 80b–17.

**COUNTS FIVE THROUGH NINE**
**(Filing a False Tax Return)**

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

1. Paragraphs 1 through 9 and 11 through 20 of Count One are incorporated here.

2. Individuals are required to truthfully report their income, including income from illegal activities, on their personal income tax return, Form 1040. Income from illegal activities must be reported as "other income" on Form 1040, Schedule 1 (Additional Income and Adjustments to Income).

3. The unauthorized transfers of Rubicon client funds to OPRE accounts controlled exclusively by defendant SCOTT MASON resulted in substantial income to defendant MASON. Defendant MASON did not report this income on his personal tax returns.

4. On or about the dates set forth below, in the Eastern District of Pennsylvania, and elsewhere, defendant

**SCOTT MASON**

willfully made and subscribed the following false United States income tax returns, Forms 1040, for the calendar years set forth below, which were verified by a written declaration that they were made under the penalties of perjury and filed with the Internal Revenue Service, which defendant MASON did not believe to be true and correct as to every material matter. Defendant MASON did not report his illegal source income on the Forms 1040, resulting in the underreporting of his total income, when, as defendant MASON knew, his actual income was substantially greater, each form constituting a separate count:

| Count | Approx. Filing Date | Tax Year | False Items |
|---|---|---|---|
| 5 | 10/10/19 | 2018 | Schedule 1, Line 21 (other income) <br> Form 1040, Line 6 (total income) |
| 6 | 10/13/20 | 2019 | Schedule 1, Line 8 (other income) <br> Form 1040, Line 7(b) (total income) |
| 7 | 9/27/21 | 2020 | Schedule 1, Line 8 (other income) <br> Form 1040, Line 9 (total income) |
| 8 | 10/4/22 | 2021 | Schedule 1, Line 8(z) (other income) <br> Form 1040, Line 9 (total income) |
| 9 | 10/11/23 | 2022 | Schedule 1, Line 8(z) (other income) <br> Form 1040, Line 9 (total income) |

All in violation of Title 26, United States Code, Section 7206(1).

## NOTICE OF FORFEITURE

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

1. As a result of the violations of Title 18, United States Code, Section 1343, and Title 15, United States Code, Sections 78j(b) and 78ff, and 17 C.F.R. § 240.10b-5, set forth in this information, defendant

**SCOTT MASON**

shall forfeit to the United States of America any property constituting, or derived from, proceeds traceable to the commission of such offenses, including, but not limited to the sum of $18,979,706.99.

2. If any of the property described above, as a result of any act or omission of the defendant:

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred to, sold to, or deposited with a third party;

   c. has been placed beyond the jurisdiction of this Court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to 21 U.S.C. § 853(p), to seek forfeiture of any other property of the defendant up to the value of the property subject to forfeiture.

All pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and Title 28, United States Code, Section 2461.

*Christine E. Ayers for*

**JACQUELINE C. ROMERO**
**UNITED STATES ATTORNEY**

*Criminal No.*

**UNITED STATES DISTRICT COURT**

Eastern District of Pennsylvania

Criminal Division

THE UNITED STATES OF AMERICA

vs.

SCOTT MASON

INFORMATION

Counts
18 U.S.C. § 1343 (wire fraud – 2 counts)
15 U.S.C. §§ 78j(b), 78ff, and 17 C.F.R. § 240.10b-5 (securities fraud – 1 count)
15 U.S.C. §§ 80b-6 and 80b-17 (investment adviser fraud – 1 count)
26 U.S.C. § 7206(1) (filing false income tax returns – 5 counts)
Notice of Forfeiture

A true bill.

_____
Foreperson

Filed in open court this _____day,
Of _____A.D. 20_____

_____
Foreperson

Bail, $_____