IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 25-25 |
| SCOTT MASON | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

    For at least 17 years, Scott Mason lived a lie. Ostensibly a successful financial adviser who provided personalized investment management services to more than 100 wealthy clients who considered him a friend, he raised his children in a beautiful Main Line home, purchased a multimillion-dollar beach house at the Jersey Shore, took luxurious international vacations, and ensured that his family wanted for nothing. But this lavish lifestyle was financed not by Mason's professional success, but by fraud and deceit. Between 2007 and 2024, Mason stole nearly $25 million from more than a dozen of his clients. Among his victims were a close family member, a childhood friend, and several clients with whom he had decades-long relationships. What began as using one particularly trusting client's savings as a personal slush fund snowballed into a sprawling fraud that grew ever more brazen as Mason desperately attempted to avoid detection by his original victim while continuing to fund his extravagant lifestyle. In the process, Mason also failed to report his millions in fraud income to the IRS.

    Since learning that the jig was up, Mason—to his credit—has cooperated with authorities and has both admitted his crimes and worked to facilitate the disposition of assets that will only begin to repay his victims for his decades of theft. In light of these facts, and in accordance with the terms of the plea agreement between the parties made pursuant to Federal Rule of Criminal

Procedure 11(c)(1)(B), the government respectfully requests that the Court impose a Guideline sentence of 97 months' incarceration and require Mason to pay full restitution to his victims.

I. **PROCEDURAL BACKGROUND**

On January 17, 2025, the government filed a nine-count information charging defendant Mason with wire fraud, in violation of 18 U.S.C. § 1343 (Counts One and Two); securities fraud, in violation of 15 U.S.C. §§ 78j(b), 78ff, and 17 C.F.R. § 240.10b-5 (Count Three); investment adviser fraud, in violation of 15 U.S.C. §§ 80b–6 and 80b–17 (Count Four); and filing false income tax returns, in violation of 26 U.S.C. § 7206(1) (Counts Five through Nine), all arising from his scheme, while acting as an investment adviser, to misappropriate funds from his clients and his failure to pay taxes on that illegal income. On January 28, 2025, Mason pled guilty to all counts, waiving prosecution by indictment, pursuant to a plea agreement governed by Federal Rule of Criminal Procedure 11(c)(1)(B). The Court has scheduled a sentencing hearing for June 25, 2025, at 10:00 a.m.

II. **FACTUAL BACKGROUND**

Defendant Scott Mason was president and sole investment advisor of Rubicon Wealth Management LLC ("Rubicon"), an investment advisory firm established in 1995 and registered with the U.S. Securities and Exchange Commission ("SEC"). Rubicon's clients were primarily high net worth individuals, many of whom permitted Mason to manage their assets on a discretionary basis and to make investment decisions on their behalf. Mason knew that his investment adviser role imposed on him a fiduciary duty to make investment decisions in his clients' best interests and to disclose to his clients any potential conflicts of interest that affected him or Rubicon.

One longtime client of Rubicon, victim S.T., was unique among Mason's clients in that Mason provided not only investment advisory services to S.T. but also a full range of concierge services, including bill payment, assisting with the upkeep and maintenance of S.T.'s multiple residential properties, and even collecting and opening S.T.'s mail. In order to facilitate Mason's provision of this wide range of financial services, S.T. granted Mason full access to S.T.'s bank and credit card accounts. S.T. and Mason agreed on a fixed annual fee to compensate Mason for both his asset management and concierge services.

From as early as 2007 until his scheme was detected in 2024, Mason abused S.T.'s trust and his unfettered access to S.T.'s accounts by periodically transferring far more than the amount to which he was entitled in legitimate fees from S.T.'s accounts to either Rubicon accounts or accounts held in Mason's own name. Mason initiated these additional payments from S.T.'s accounts on an ad hoc basis; the timing and amount of the fraudulent transfers correlated with a need to cover expenses incurred by Rubicon and Mason personally. S.T. trusted Mason to manage his finances and to act in S.T.'s best interests, and did not closely review or question Mason's transfers of S.T.'s funds. Over time, Mason siphoned off millions of dollars from S.T.'s accounts.

To avoid detection and further his fraudulent scheme, Mason frequently ignored S.T.'s instructions with respect to the management of S.T.'s finances. In one instance, S.T. directed Mason to pay off a $5 million line of credit at JPMorgan Chase with the proceeds from the sale of one of S.T.'s properties. Mason represented to S.T. that he had paid off the line of credit but in fact did not do so, which resulted in additional interest charges to S.T. totaling more than $1.48 million over a decade-long period.[1]

---

[1] Application Note 3(C)(i) of the United States Sentencing Guidelines excludes "[i]nterest of any kind" from the loss calculation pursuant to Section 2B1.1 of the Guidelines, the operative

3

By around 2017, Mason had stolen so much from S.T. that his scheme was at serious risk of detection. So, in an effort to replace some of the funds he had fraudulently transferred from S.T.'s accounts—and to continue financing his extravagant lifestyle—Mason expanded his fraud to more Rubicon client accounts. Mason began to transfer funds, without authorization, from other Rubicon clients to an entity that he had formed in June 2016: Orchard Park Real Estate Holdings LLC ("OPRE"), a holding company for several residential investment properties that Mason purchased in Geneva, New York. Beginning in December 2016 and continuing through April 2024, Mason periodically transferred funds from several Rubicon client advisory accounts at SEI Private Trust Company ("SPTC") and Fidelity Investments ("Fidelity") to OPRE bank accounts that he controlled, without the clients' knowledge or authorization. Mason targeted Rubicon clients with whom he had longstanding relationships and who trusted him implicitly, including longtime friends and family members, knowing that these clients were unlikely to question him about his management of their assets.

Transfers to OPRE ranged from a few thousand dollars up to $1.25 million. In order to fund the fraudulent transfers, Mason often liquidated Rubicon clients' securities holdings, including their shares of money market funds (highly liquid mutual funds). On some occasions, Mason forged Rubicon clients' electronic or ink signatures on distribution authorization forms, without the clients' permission. On other occasions, he presented the distribution form to a client for signing but omitted all pertinent details regarding the so-called "investment" he was asking

---

Guideline in this case. (The inclusion of this amount in the § 2B1.1 calculation, however, would *not* have altered Mason's Guidelines.) Nevertheless, the government contends—and the Probation Office agrees—that Mason's restitution obligation to S.T. should include this amount ($1,489,181.31), which represents actual loss suffered by S.T. *See* PSR ¶ 28 n.3. It is the government's understanding that Mason does not object to the inclusion of this amount in his restitution order.

the client to authorize, including his relationship to OPRE, or he falsely represented to the client that he was transferring the client's funds outside SPTC or Fidelity to invest in diversified short-term bonds. Mason never disclosed the fact that these transfers were not legitimate investments but instead were simply his misappropriation of client funds, which he sent to an entity that he controlled for his sole benefit.

In total, between December 2016 and April 2024, Mason brazenly transferred approximately $17,364,674.91, belonging to 13 Rubicon clients to three different OPRE bank accounts, all controlled by Mason. The amount that Mason stole from any given client ranged from $50,000 to over $3 million. As noted above, Mason used the funds not only to finance his lavish lifestyle—which included international travel, country club memberships, and the purchase of an ownership stake in a miniature golf course in Barnegat Light, New Jersey—but also to transfer money back to accounts owned by victim S.T., in an effort to conceal the fact that Mason had been misappropriating funds from S.T. for many years. Notwithstanding the return transfers that Mason made to S.T. from OPRE accounts, Mason stole a net total of $6,144,740.24 from S.T.

Finally, Mason signed and filed personal tax returns for tax years 2017 through 2022 without reporting any of the fraud proceeds that he obtained through his unauthorized transfers of client funds to OPRE accounts (Counts Five through Nine), resulting in a tax loss of approximately $2,353,355.

### III. SENTENCING CALCULATION

#### A. Statutory Maximum Sentences

The statutory maximum sentence on each of Counts One and Two (wire fraud) is 20 years' imprisonment, a three-year period of supervised release, a $250,000 fine, and a $100

special assessment; on Count Three (securities fraud), 20 years' imprisonment, a three-year period of supervised release, a $5,000,000 fine, and a $100 special assessment; on Count Four (investment adviser fraud), five years' imprisonment, a three-year period of supervised release, a $10,000 fine, and a $100 special assessment; and on each of Counts Five through Nine (filing false tax returns), three years' imprisonment, a one-year period of supervised release, a $250,000 fine, and a $100 special assessment.

Thus, in light of his guilty plea to Counts One through Nine, Mason faces a total maximum penalty of 80 years' imprisonment, a three-year period of supervised release, a $6,760,000 fine, and a $900 special assessment. Full restitution also shall be ordered in relation to the conduct charged in Counts One through Four, and may be ordered in relation to the conduct charged in Counts Five through Nine. Forfeiture of any property constituting, or derived from, proceeds traceable to the commission of such offenses also may be ordered.[2]

### B. Sentencing Guideline Calculation

The U.S. Probation Office has concluded that Mason's advisory Guideline range is 97 to 121 months' imprisonment, given an offense level of 30 and a criminal history category of I. *See* PSR ¶ 115. The government and the defendant agree with this calculation.

For purposes of calculating Mason's offense level, the government agrees that Counts One through Four (referred to in the PSR as "the Frauds") are grouped together, while the tax offenses (Counts Five through Nine) form a separate group. *Id.* ¶¶ 48-49. As to Group One (the Frauds), the government agrees that Mason's base offense level is 7, pursuant to U.S.S.G. § 2B1.1(a)(1). *Id.* ¶ 52. The offense level is increased by 20 levels pursuant to U.S.S.G.

---

[2] The Court issued a Preliminary Order of Forfeiture on April 17, 2025 (ECF no. 17), entering a money judgment in the amount of $18,979,706.99, and finding a specified set of assets subject to forfeiture.

§ 2B1.1(b)(1)(K) because the loss amount for which Mason is responsible, $23,509,415.15,[3] is between $9.5 million and $25 million. *Id.* ¶ 53. The offense level is increased by two additional levels under U.S.S.G. § 2B1.1(b)(2)(A)(i) because the offense involved 10 or more victims. *Id.* ¶ 54. Finally, the offense level is increased by four further levels pursuant to U.S.S.G. § 2B1.1(b)(20)(A)(iii) because the offenses involved a violation of securities law and, at the time of the offenses, Mason was an investment adviser. *Id.* ¶ 55. The resulting subtotal for Group One is 33. *Id.* ¶ 59.

As to Group Two (the tax offenses), the government agrees that the base offense level is 22 because the tax loss ($2,353,355) was more than $1.5 million but less than $3.5 million, pursuant to U.S.S.G. §§ 2T1.1, 2T4.1(I). *Id.* ¶ 60. In addition, two levels are added, pursuant to U.S.S.G. § 2T1.1(b)(1), because Mason failed to report the source of income exceeding $10,000 in any year from criminal activity. *Id.* ¶ 61. Thus, the subtotal for Group Two is 24. *Id.* ¶ 65. However, pursuant to U.S.S.G. § 3D1.4, Group Two does not increase Mason's offense level because it is 9 levels less serious than Group One. *Id.* ¶ 66.

Mason is eligible for a three-level downward adjustment for his timely acceptance of responsibility, pursuant to U.S.S.G. §§ 3E1.1(a) and (b). *Id.* ¶¶ 71-72. The resulting total offense level is 30. *Id.* ¶ 73.

Mason has no criminal history and is therefore in criminal history category I. *Id.* ¶¶ 74-77.[4] In total, considering an offense level of 30 and a criminal history category of I, Mason's Guideline range is 97 to 121 months' imprisonment. *Id.* ¶ 115.

---

[3] This total combines the funds that Mason stole from victims through the OPRE scheme, charged in Count One ($17,364,674.91), with the net amount he stole from victim S.T., charged in Count Two ($6,144,740.24).

[4] Despite the fact that Mason received no criminal history points, the Probation Office has concluded that Mason is not entitled to a two-level zero-point offender reduction pursuant to

IV.     **ANALYSIS OF STATUTORY FACTORS**

The Supreme Court has declared that "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). This Court must also consider all of the sentencing factors set forth in 18 U.S.C. § 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a). In accordance with Paragraph 5 of the parties' plea agreement, Mason and the government have agreed—pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B)—that a sentence at the bottom of the applicable Sentencing Guideline range is the appropriate disposition of this case.[5] The Probation Office has correctly calculated that range to be 97 to 121 months. For the reasons set forth below, the government

---

U.S.S.G. § 4C1.1 because he personally caused substantial financial hardship to at least one victim. *See* U.S.S.G. § 4C1.1(a)(6). The government agrees with this conclusion and Mason has not objected to it.

[5] The parties further recognized in Paragraph 5 of the plea agreement that this joint recommendation is not binding on the Court.

submits that a sentence of 97 months' imprisonment is an appropriate sentence supported by each of the § 3553(a) factors.

      **A.**      **The Nature, Circumstances, and Seriousness of the Offense**

The severity of Mason's crimes is obvious. Not only did he steal nearly $25 million from his clients—an eye-popping sum—but he did so, repeatedly and systematically, over a 17-year period. Those stolen funds were Mason's primary source of income: the legitimate salary he earned (approximately $300,000 per year, *see* PSR ¶ 107) pales in comparison to the money he stole from the very clients who placed their trust and their finances in his hands. He simply took as much as he needed to fuel the lifestyle that he coveted, apparently without a second thought. And when the magnitude of his crimes against his first victim (S.T.) became too great to avoid detection, he started stealing from others. His greed, and the frequency and size of his fraudulent transfers, only accelerated over time. There is no reason to assume that Mason ever would have stopped had one of his employees not discovered the fraud last year.

As a registered investment adviser, Mason had a fiduciary duty to his clients. His fraud represents the ultimate abuse of that position of trust and Mason specifically selected victims who would be particularly unlikely to question his management of their assets, either because they were very busy with their careers or other commitments, because they were unfamiliar with investment strategy given that a sick or deceased spouse had previously been responsible for managing their family's finances, or—most often—simply because this group of clients trusted Mason completely based on their longstanding personal history. His chosen victims were those who were closest to him, including a relative who had known him since childhood and a family friend who grew up with him.

Although Mason's victims have generally been able to bear this loss—indeed, Mason admitted during his government proffers that he also targeted clients with substantial liquid assets who would be less likely to notice the missing funds—that money represented years of hard work and sacrifice by his clients. The vast majority of their stolen funds has simply evaporated, having been squandered by Mason over a two-decade period of living far above his means. And notwithstanding an anticipated order requiring full restitution, it is unlikely that Mason—who is 66 years old and facing not only a lengthy term of imprisonment but who has also been barred from his chosen professional field and is now working a minimum wage job, *see* PSR ¶¶ 106-07 n.12—will ever come close to making his victims whole. As detailed in their impact statements,[6] his victims expected to leave the money Mason stole to their children or grandchildren, hoped to enjoy retirements unburdened by financial concerns, and have even been forced to question whether they will be able to continue providing proper care for ailing loved ones. Mason stole not only their money, but also their peace of mind. For all of these reasons, a Guideline sentence of 97 months is fully justified here.

### B.     The History and Characteristics of the Defendant

Mason's personal history also supports a sentence within, but at the bottom of, the Guideline range. Nothing in his background mitigates Mason's criminal conduct. He had a stable middle-class upbringing, PSR ¶ 84; has been married for over 45 years and enjoys a close relationship with his children, *id.* ¶¶ 85-86; and has been consistently employed since graduating from college, *id.* ¶¶ 107-08.[7] If anything, Mason's unique family history is an aggravating factor.

---

[6] Most victims provided their impact statements to the Probation Office, and those are quoted in full in the PSR. *See* PSR ¶¶ 29-40. One additional victim, D.M., recently submitted his statement directly to the government. It has been filed under seal in connection with this memorandum.

[7] The Probation Office discusses in the PSR Mason's history of alcoholism. PSR ¶¶ 99-100. To his credit, Mason does not appear to offer his alcohol addiction as either an excuse or an

This is not the first time Mason has seen the consequences of white collar crime. His father, who also worked in the investment industry, was convicted of engaging in a Ponzi scheme when Mason was in his 20s, and his father also faced SEC sanctions in the 1990s arising from additional, unrelated misconduct. *Id.* ¶ 82 & n.6.[8] The fact that his father was prosecuted for committing crimes similar to his own, and that Mason was nevertheless undeterred from following in his father's footsteps, suggests that Mason made a conscious decision that even if he got caught—as his father did—whatever punishment he might receive was still worth the risk.

That being said, the government does credit Mason with coming forward early in this investigation. After learning that one of Rubicon's primary asset custodians (SEI Private Trust Company) was terminating its relationship with Rubicon, Mason—through his counsel—contacted the government regarding his financial crimes before being formally advised of the government's criminal investigation. He sat for a multi-day proffer during which he described his criminal conduct in impressive detail, and he has moved to swiftly liquidate several substantial assets, including, most significantly, a home on Long Beach Island, New Jersey, prior to sentencing.[9] In addition, his agreement to proceed by information in this case, sparing his victims from potentially being required to testify at trial, is also indicative of his desire to accept

---

explanation for his criminal conduct. While the government commends Mason for the recent steps he has taken to address his alcohol dependency and does not wish to deny him any available opportunities for treatment while incarcerated, the government defers to the Probation Office and the Court as to whether Mason is a good candidate for the Bureau of Prisons' Residential Drug Abuse Program. *See id.* ¶ 99 n.10.

[8] The government is not aware of the specifics of the penalties imposed on the elder Mr. Mason, but the PSR indicates that he served a period of imprisonment in a work-release program.

[9] The government anticipates taking custody of approximately $4 million in assets (or the proceeds from the sale of those assets) by the time of or shortly after sentencing. The government intends to recommend that the forfeited assets be remitted or restored to Mason's victims as partial restitution for their losses in this case.

11

responsibility for his actions. Importantly, however, the government took into consideration the extent and timeliness of Mason's cooperation in making its charging decisions in this case; thus, a recommendation of a sentence at the bottom of the applicable Guideline sentencing range fully accounts for Mason's cooperation in this investigation.

### C.     The Need for Adequate Deterrence

In fashioning the appropriate sentence, the Court should account for both specific and general deterrence. As to specific deterrence, although this is Mason's first criminal conviction, he witnessed firsthand the consequences his father suffered as a result of his own crimes. While Mason reported in his presentence interview that his father's conviction was "extremely traumatic," PSR ¶ 84, it was obviously not traumatic enough to deter Mason from following in his footsteps. For that reason, a substantial sentence is necessary to ensure that Mason is not again tempted to commit financial crimes upon his release. As to general deterrence, these are high-dollar-value financial crimes that must be accompanied by an equally severe penalty to deter other financial professionals from succumbing to the temptation of helping themselves to quick and easy cash.

### D.     Remaining Sentencing Considerations

The government is not aware of the need to provide Mason with any specialized educational or vocational training or medical care, and the Probation Office did not identify any medical conditions that would present an issue for sentencing. PSR ¶ 95. In order to avoid unwarranted sentencing disparities, adherence to the advisory Guideline range is an effective mechanism for assuring that a defendant's sentence is consistent with those imposed nationwide on similarly situated offenders and here, the government requests just such a sentence.

## V. **RESTITUTION**

The government respectfully requests that the Court order Mason to pay restitution in the amount of $24,998,596.46 to his fraud victims (the loss amount as calculated pursuant to U.S.S.G. § 2B1.1 ($23,509,415.15), plus $1,489,181.31 in interest payments made by victim S.T. after Mason ignored S.T.'s instruction to pay off a large line of credit in order to further his fraud). The government further requests that Mason be ordered to pay restitution of $2,353,355 to the IRS, which represents the total tax due and owing on his unreported fraud income from tax years 2017 through 2022.

## VI.  CONCLUSION

For the reasons set forth above, the government requests that the Court impose a sentence of 97 months' imprisonment, the bottom of the applicable Sentencing Guideline range, which reflects the parties' agreement as to the appropriate disposition of this case. Such a sentence is sufficient, but not greater than necessary, to address the factors set forth in § 3553(a). The government further requests that the defendant be required to pay restitution in the amount of $24,998,596.46 to his fraud victims,[10] and restitution of $2,353,355 to the IRS.

Respectfully submitted,

DAVID METCALF
United States Attorney

 */s/ Jessica Rice*
JESSICA RICE
Assistant United States Attorney

Dated: June 18, 2025

---

[10] A list of restitution amounts due to each individual victim will be filed under seal in connection with this memorandum.

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the Government's Sentencing Memorandum has been served by electronic filing (ECF) upon the following:

Michael J. Rinaldi
Mary P. Hansen
Duane Morris LLP
30 South 17th Street
Philadelphia, PA 19103
mjrinaldi@duanemorris.com
mphansen@duanemorris.com

          */s/ Jessica Rice*
          JESSICA RICE
          Assistant United States Attorney

Dated: June 18, 2025